# STATE OF RHODE ISLAND

PROVIDENCE, SC. SUPERIOR COURT

| | |
|---|---|
| MOJOTECH, LLC,,<br>Plaintiff,<br>v.<br>SPAR GROUP, INC.,<br>Defendant. | C.A. No. PC-2026-_________ |

## COMPLAINT

Plaintiff MojoTech, LLC brings this action against Defendant SPAR Group, Inc. to recover $296,400.00 in unpaid fees, together with interest and attorney's fees, for software design and development services that MojoTech performed, that SPAR accepted, and that SPAR has repeatedly acknowledged it owes.

## PARTIES

1. Plaintiff MojoTech, LLC ("MojoTech") is a Delaware limited liability company with its principal place of business at 56 Exchange Terrace, Suite 210, Providence, Rhode Island 02903.

2. Defendant SPAR Group, Inc. ("SPAR") is a Delaware corporation whose principal executive offices are located at 110 East Boulevard, Suite 1600, Charlotte, North Carolina 28203. At the time the parties entered into the Master Services Agreement described below, SPAR's address of record was 1910 Opdyke Court, Auburn Hills, Michigan 48326.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction under R.I. Gen. Laws § 8-2-14 because the amount in controversy exceeds ten thousand dollars ($10,000.00).

Case Number: PC-2026-05196
Filed in Providence/Bristol County Superior Court
Submitted: 9/17/2026 3:16 PM
Envelope: 5843489
Reviewer: Alexa G.

4. Venue is proper in this county. Section 9.9 of the Master Services Agreement provides that “the parties agree to settle the dispute in state or federal courts located in Providence County, Providence, Rhode Island.”

5. This Court has personal jurisdiction over SPAR because SPAR contractually consented to it. Section 9.6 of the parties' Master Services Agreement provides that "each party hereby irrevocably agrees to the personal jurisdiction and venue of any court located in Providence County, Providence, Rhode Island.

**FACTUAL ALLEGATIONS**

6. On or about August 16, 2022, MojoTech and SPAR entered into a written Master Services Agreement (the “MSA”). A true and accurate copy of the MSA is attached as **Exhibit A**.

7. The MSA was executed on SPAR’s behalf by William Linnane, then SPAR’s Chief Strategy and Growth Officer and now its President and Chief Executive Officer.

8. Section 1 of the MSA provides that MojoTech would perform services for SPAR “as described in one or more Statements of Work.”

9. Section 6.1.2 of the MSA provides that MojoTech “shall invoice Client in arrears for each monthly billing period (‘Billing Period’) for all Fees and Expenses,” that “[a]ny such invoice shall be payable by check, wire transfer, or ACH,” and that “[p]ayment is due within 14 days of the end of each monthly Billing Period.”

10. Section 9.9 of the MSA provides that “upon a judgment being entered by a court of competent jurisdiction, the prevailing party in such litigation shall be entitled to reimbursement of that party’s reasonable attorney’s fees from the losing party.”

11. On or about March 16, 2026, the parties executed a Statement of Work titled “SOW 2 of 2026 – Data Integration Layer MVP Build” (the “Data Integration SOW”). A true and accurate copy is attached as **Exhibit B**.

12. The Data Integration SOW provides that it "is made pursuant to the Master Services Agreement dated August 16, 2022 between Company and Client (the 'Master Agreement')."

13. The Data Integration SOW provides that "[t]he Company will charge $396,000 in project fees, plus travel fees as needed," and that invoicing "will be tied to the end of each sprint and the acceptance of deliverables created during that sprint." It further provides that "[c]lients will have up to 2 business days to accept or reject any deliverables based on the sprint's work."

14. On or about April 8, 2026, the parties executed a second Statement of Work titled "SOW 3 of 2026 – Agentic Field Management Design Phase SOW" (the "Field Management SOW"). A true and accurate copy is attached as **Exhibit C**. The MSA and the two Statements of Work are referred to collectively as the "Agreements."

15. The Field Management SOW contains the same incorporation language, providing that it "is made pursuant to the Master Services Agreement dated August 16, 2022 between Company and Client." It provides that MojoTech would bill "at a weekly estimated price of $46,875 on a time and materials basis for Services performed under this SOW."

16. MojoTech performed every obligation the Agreements required of it. It staffed both engagements and delivered the work product called for by each Statement of Work.

17. At no time has SPAR rejected a deliverable, exercised the two-business-day rejection right in the Data Integration SOW, disputed the quality or sufficiency of MojoTech's work, or disputed any invoice.

18. In or about early June 2026, Mr. Jewett, acting on SPAR's behalf, directed MojoTech to stand down. The reason given was a change in SPAR's strategic direction. No deficiency in MojoTech's performance was identified.

19. MojoTech has performed no work for SPAR since that date, and it invoiced SPAR only for work actually performed.

20. MojoTech issued invoices to SPAR for the services it performed. True and accurate copies of the invoices that remain unpaid are attached collectively as **Exhibit D**.

21. The four unpaid invoices total $296,400.00.

22. Each invoice states payment terms of "Net 14" and states on its face that "[i]nterest will accrue at 1% per month, beginning one month past the due date listed on the invoice."

23. On or about June 4, 2026, after SPAR's invoices had become past due, Mr. Jewett introduced MojoTech's Chief Executive Officer, Jason Grimm, to SPAR's Chief Financial Officer, Steven Hennen, for the purpose of arranging a payment plan.

24. On or about June 15, 2026, Mr. Hennen indicated that SPAR would pay MojoTech $50,000.00 every two weeks until the outstanding balance was paid in full.

25. SPAR made three subsequent payments $50,000.33 on June 19, 2026; $44,999.67 on July 10, 2026; and $49,500.00 on July 24, 2026.

26. After making such payments, SPAR stopped paying. Mr. Grimm attempted to reach SPAR repeatedly concerning the unpaid invoices and did not receive a response.

27. On August 26, 2026, Mr. Grimm advised Mr. Hennen that MojoTech would be engaging counsel to collect the outstanding balance. SPAR paid $49,500.00 the following day, August 27, 2026.

28. SPAR has paid nothing since August 27, 2026. The principal balance of $296,400.00 remains due and owing.

29. On September 1, 2026, MojoTech, through counsel, made written demand upon SPAR for payment of $296,400.00 together with accrued interest, and set a deadline of September 4, 2026. A true and accurate copy of that demand letter is attached as **Exhibit E**.

**COUNT I**
**(Breach of Contract)**

30. MojoTech repeats and realleges each and every allegation set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

31. The Agreements are valid and binding contracts between MojoTech and SPAR.

32. MojoTech performed all of its obligations under the Agreements.

33. SPAR breached the Agreements by failing and refusing to pay the amounts invoiced under them, including but not limited to Section 6.1.2 of the MSA and the payment terms of the Statements of Work.

34. As a direct and proximate result of SPAR's breach, MojoTech has been damaged in the principal amount of $296,400.00, together with interest accruing at the contractual rate of one percent (1%) per month as stated on each invoice, and together with reasonable attorney's fees.

**COUNT II**
**(Account Stated)**

35. MojoTech repeats and realleges each and every allegation set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

36. MojoTech rendered invoices to SPAR for services performed, and SPAR received them without objection.

37. SPAR did not dispute any invoice, either as to the services rendered or as to the amounts charged.

38. SPAR expressly acknowledged the balance due, agreed to a schedule for paying it, and made four payments against it, thereby assenting to the account as stated.

39. The balance due on the account stated is $296,400.00, which SPAR has failed and refused to pay.

**COUNT III**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

40. MojoTech repeats and realleges each and every allegation set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

41. Implied in every contract is a covenant of good faith and fair dealing, which obligates each party to refrain from conduct that impairs the other party's right to receive the benefits of the agreement.

42. SPAR owed MojoTech that duty under the Agreements.

43. SPAR breached that duty. It accepted MojoTech's work without objection and then withheld payment for it. It represented that it would pay the outstanding balance in installments of $50,000.00 every two weeks until the balance was paid in full, made three payments toward that commitment, and then abandoned the schedule without explanation. It disregarded MojoTech's repeated attempts to obtain payment. It resumed payment only after MojoTech advised that it would be engaging counsel, and then stopped again.

44. SPAR's conduct was not a mere failure to perform. It deprived MojoTech of the benefit of its bargain to defer an obligation SPAR had already acknowledged.

45. As a direct and proximate result of SPAR's breach of the implied covenant, MojoTech has been damaged in an amount not less than $296,400.00, together with interest and the reasonable attorney's fees provided by Section 9.9 of the MSA.

**COUNT IV**
**(Unjust Enrichment)**

46. MojoTech repeats and realleges each and every allegation set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

47. MojoTech conferred a benefit upon SPAR by designing, building, and delivering the data integration and field management work product described above.

48. SPAR appreciated and knowingly accepted that benefit. It received the work product into its own technology environment and, under Section 4.5 of the MSA, has not acquired ownership of the Type A Deliverables because it has not made full payment.

49. SPAR's retention of that benefit without paying its reasonable value is inequitable under the circumstances.

50. MojoTech is entitled to recover the reasonable value of the services conferred, which is not less than $296,400.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff MojoTech, LLC respectfully requests that this Honorable Court:

a. Enter judgment in its favor and against Defendant SPAR Group, Inc. on Counts I through IV of this Complaint;

b. Award MojoTech damages in the principal amount of $296,400.00;

c. Award contractual interest at the rate of one percent (1%) per month as stated on each invoice, or, in the alternative, prejudgment interest pursuant to R.I. Gen. Laws § 9-21-10;

d. Award post-judgment interest as provided by law;

e. Award MojoTech its reasonable attorney's fees pursuant to Section 9.9 of the Master Services Agreement;

f. Award MojoTech its costs of suit; and

g. Grant such other and further relief as this Court deems just and proper.

Plaintiff,

MOJOTECH, LLC,

By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP

*/s/ Alicia J. Samolis*

Alicia J. Samolis (#7316)
Kevin J. Keenan (#11221)
40 Westminster Street, Suite 1100
Providence, RI 02903
(401) 861-8200
(401) 861-8210 FAX
asamolis@psh.com
kkeenan@psh.com

DATED: September 17, 2026

# EXHIBIT A

# MASTER SERVICES AGREEMENT

This Master Services Agreement ("Agreement"), dated ~~March~~ AUGUST 16, 2022, is made between MojoTech, LLC, a Delaware limited liability company with its principal place of business at 56 Exchange Terrace Suite 210 Providence, RI 02903 ("Company") and SPAR Group, Inc. having offices at 1910 Opdyke Court, Auburn Hills, MI, 48326, or its assigns ("Client").

## RECITALS

WHEREAS, Company is in the business of computer software consulting, design, and development services.

WHEREAS, Client desires to engage Company to provide software consulting, design, and development services, and Company agrees to perform such services, on the terms and conditions set forth herein.

WHEREAS, Company and Client agree that this Agreement shall apply to all such future services.

## AGREEMENT

THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

## 1. Services

Company agrees to perform services for Client as described in one or more Statements of Work, the form of which are attached hereto as exhibits (the "Services"). Any conflict or inconsistency between the provisions of this Agreement and any executed Statement of Work shall be resolved by giving precedence to the executed Statement of Work under which the Services are to be performed and then to this Agreement.

## 2. Cooperation

Client shall assist Company in the performance of its obligations under this Agreement and shall undertake the responsibilities specified in this Section 2 at its own expense. Client shall make available to Company a designated representative: William Linnane ("Client's Representative"), who shall be authorized to make binding decisions for Client regarding the obligations which are the subject of this Agreement, and shall perform or have performed other duties and requirements of Client as set forth in this Agreement or in an applicable Statement of Work.

## 3. Reliance

Client understands that Company shall rely upon Client's Representative as having the authority specified in Section 2 herein and that all official communications from Company to Client shall be addressed to Client's Representative.

## 4. Work Provisions

### 4.1 Independent Contractor

For all purposes hereof and in the performance of its obligations under this Agreement, Company is and shall remain an

independent contractor and nothing in this Agreement or in a Statement of Work shall be deemed or construed to create an employer/employee, joint venture or partnership relationship between Company and Client. Nothing herein shall be deemed or construed to create an employment relationship between Client and any employee, agent or independent contractor of Company. Neither party shall have any authority to insure any obligations on behalf of the other party or to make any promise, representation or contract of any nature on behalf of the other party.

### 4.2 Company's Personnel

Unless otherwise stated in the applicable Statement of Work, Company shall have sole discretion over the identity of its personnel used to provide the Services, provided that Company shall ensure that the personnel are in all cases suitably qualified and experienced. Where specific personnel are specified in an applicable Statement of Work, Company shall use reasonable efforts to provide the Services through those personnel, provided that Company shall be entitled to replace such personnel with personnel of equivalent qualification and experience on no less than 5 business days notice to Client.

### 4.3 Non-Exclusivity

Without authorizing Company (or its personnel) to engage in any conduct or activities which would result in a breach or violation of any term of this Agreement, Client recognizes that Company's personnel providing services to Client under this Agreement may perform similar services from time to time for other persons, and this Agreement shall not prevent Company from using such personnel for the performance of such similar services for such other persons. Company recognizes that Client may engage other consultants to perform similar services from time to time, and this Agreement shall not prevent Client from using such consultants.

### 4.4 Intellectual Property Definitions

**4.4.1 Client's Business** shall mean a merchandising and brand marketing services company, providing a broad range of sales enhancing services to retailers across most classes of trade and consumer goods manufacturers and distributors around the world, and any other application features or functionality related to the same.

**4.4.2 "Type A Deliverables"** shall mean Deliverables that are specific to Client's Business, including, but not limited to source code and documentation associated therewith. Examples of Type A Deliverables include custom graphics and view templates, helper modules, model and controller classes, and executable specifications and tests, used by the developers to build software applications.

**4.4.3 "Type B Deliverables"** shall mean Deliverables that are not specific to Client's Business, including, but not limited to frameworks, tools, methodologies, know-how, plug-in and third party source code and documentation associated therewith. Examples of Type B Deliverables might include patches and enhancements to open source libraries, and/or the numerous plug-ins available from third parties, contributions to which are generally-accepted practice in the open-source world.

### 4.5 Ownership

Except as otherwise set forth herein, the entire right, title and interest in to Type A Deliverables, including, without limitation, the software, documentation, source code, and all modifications to the foregoing, and all portions thereof, together with all proprietary rights relating thereto, including, without limitation, all intellectual property rights such as copyrights, patent and trade secret rights, are the exclusive property of the Client upon full payment. Under no circumstances may Company use the Type A Deliverables, or any component part thereof, for its own benefit or for the benefit of any third-party.

**4.5.1 Works-for-hire** Type A Deliverables shall be deemed works-for-hire and shall be the exclusive property of Client. Company expressly agrees to assign to Client the copyright in any Type A Deliverables that do not meet the requirements of a work-for-hire under the U.S. Copyright Act, as soon as such work is fixed in a tangible form or medium. Additionally, independent of the U.S. Copyright Act, Company hereby assigns to client, to the fullest extent possible under the law, all of its right, title and interest, if any, in and to the Type A Deliverables. Company further agrees to execute and deliver such instrument(s) and to take such action(s) as may be required and/or requested by Client to confirm and/or defend Client's sole and exclusive ownership of the Type A Deliverables. Except as otherwise set forth

herein, the entire right, title and interest in and to Type B Deliverables, including, without limitation, the software, documentation, source code, and all modifications to the foregoing, and all portions thereof, together with all proprietary rights relating thereto, including, without limitation, all copyrights, patent and trade secret rights, are owned exclusively by Company.

**4.5.2 License** Company hereby grants to Client a perpetual, irrevocable, non-exclusive, royalty-free, worldwide license, to use the Type B Deliverables in furtherance of Client's Business.

## 5. Warranties

### 5.1 Warranty of Authority; No Conflict

Each party warrants that it is authorized to enter into this Agreement and to perform its obligations hereunder, and that its performance hereunder shall not conflict with, limit or be contrary to any other agreement.

### 5.2 Warranty of Services and Software

**5.2.1 Professional Manner** Company warrants that all services will be performed in a timely, professional and workmanlike manner consistent with good and sound professional procedures and in accordance with generally accepted industry standards, using qualified professional personnel.

THE WARRANTIES SET FORTH IN THIS AGREEMENT ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. EXCEPT WHEN OTHERWISE STATED IN WRITING THE MATERIALS PRODUCED UNDER THE TERMS OF THIS AGREEMENT ARE PROVIDED TO CLIENT **"AS IS,"** THAT IS, WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESSED OR IMPLIED. THE ENTIRE RISK AS TO THE QUALITY AND PERFORMANCE OF THE SOFTWARE AND/OR SERVICES PROVIDED UNDER THIS AGREEMENT RESTS SOLELY WITH THE CLIENT. SHOULD THE SOFTWARE OR PROGRAM PROVE DEFECTIVE, CLIENT SOLELY ASSUMES THE COST OF ALL NECESSARY SERVICING, REPAIR OR CORRECTION, INCLUDING WITHOUT LIMITATION ANY "DEBUGGING." CLIENT ACKNOWLEDGES THAT THE SCOPE AND CONTENT OF THE DELIVERABLES AND SERVICES, OTHER THAN PROGRAM CODE, ARE GOVERNED AND DIRECTLY RESULT FROM THE APPLICABLE SPECIFICATIONS PROVIDED BY CLIENT. Company's process allows Client to continually adjust specifications in response to feedback, lessons learned, and shifting priorities. Client has control over the level of feature specification, the order of feature development, and the priority of debugging. Company will advise Client on balancing feature development (speed) and debugging (accuracy) to help Client leverage this flexibility as a competitive advantage. Company does not distinguish (for billing purposes) between feature development and debugging.

EXCEPT AS OTHERWISE STATED ABOVE, NEITHER PARTY MAKES ANY WARRANTIES OF ANY KIND OR NATURE, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, WARRANTIES RELATED TO INFORMATION OR BUSINESS ADVICE PROVIDED, WARRANTIES RELATED TO OUTCOMES BASED ON INFORMATION OR ADVICE PROVIDED, WARRANTIES OF MERCHANTABILITY OR MERCANTILE QUALITY, WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE OR USE, WARRANTIES OR CONDITIONS ARISING BY STATUTE OR OTHERWISE IN LAW, OR WARRANTIES OF ANY PRODUCTS OR SERVICES PROVIDED BY THIRD PARTY VENDORS.

THE PARTIES AGREE THAT NEITHER PARTY'S LIABILITY FOR DAMAGES FROM ANY CAUSE OF ACTION WHATSOEVER, REGARDLESS OF THE FORM OF ACTION, WILL EXCEED THE FEES PAID OR TO BE PAID BY CLIENT PURSUANT TO AN APPLICABLE STATEMENT OF WORK UNDER THIS AGREEMENT. IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR LOST PROFITS OR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES OF ANY NATURE WHATSOEVER, INCLUDING, WITHOUT LIMITATION, DAMAGES ARISING FROM LOSS OF USE OF ANY SOFTWARE OR HARDWARE, COSTS OF PROCUREMENT OF SUBSTITUTE PRODUCTS OR SERVICES, LOST DATA, LOST PROFITS OR REVENUE, OR FOR ANY CLAIM OR DEMAND BY ANY THIRD PERSON, ARISING OUT OF OR RELATED TO THE AGREEMENT OR THE PERFORMANCE OR BREACH THEREOF, EVEN IF ADVISED OF THIS POSSIBILITY. This limitation of liability represents an allocation of risks between Company and Client, which allocation is reflected in the price of the Services.

**5.2.2 No Infringement** The parties represent and warrant that their disclosure and delivery of any information,

documents, software and other materials, and use thereof, as contemplated by this Agreement, will not knowingly infringe or violate any proprietary right of any third party, including, without limitation, any copyright, known patent or trade secret right.

Company represents and warrants that all Type A Deliverables shall be Company's original work product and do not infringe upon or otherwise violate or misappropriate any copyrights, or to the knowledge of Company, any other intellectual property rights, of any third party. The Type A Deliverables shall not include any subject matter for which the copyright, or, to the knowledge of Company, any other intellectual property right, is owned by a third party and cannot be assigned to Client.

### 5.3 Noninterference with Business

During the term of this Agreement and for a period of two years thereafter, the Client and Company (each, a "Party") agrees not to directly compete or interfere with the business of the other Party, as currently conducted, in any manner. Additionally, and without limiting the foregoing, during the term of this Agreement and for a period of two years thereafter, each Party agrees not to, directly or indirectly solicit or induce or attempt to persuade any employee, independent contractor, vendor, supplier, outsourced third party, director or other participant of the other Party to terminate an employment, contractual or other relationship with the other Party, or to enter into a relationship with such Party or into any business organization in which such Party may be directly or indirectly involved. The term "enter into a relationship" shall include, but not be limited to, acting as a paid or unpaid director, officer, agent, employee of, or consultant to, or acting or participating as owner, partner, manager, member, or shareholder. During and for a period of two years immediately following termination of this Agreement and subject to Section 4.3, each Party further agrees not to (a) directly or indirectly contact any person or entity disclosed by other Party for the purpose of taking advantage of a business opportunity, (b) otherwise circumvent a relationship with the other Party, or establish a relationship with a party with whom the other Party already has a relationship or foreseeable relationship with whom such Party has never had a relationship, or (c) seek to establish any rights, including but not limited to intellectual property rights, anywhere in the world in conflict with the other Party's pre-existing, herein established, or hereafter established intellectual or other property or proprietary rights.

## 6. Fees, Invoices, Payment

### 6.1 Fees

Client shall pay company based on the number of resources assigned to Client's project ("Team Strength") and will be invoiced for time and materials at the rates set forth on the applicable Statements of Work ("Fees").

**6.1.1 Definitions** Company rates are determined with the following definitions: A weekly Team Strength of 1.0 includes a minimum of 35 hours.

**6.1.2 Invoices/Payment** Company shall invoice Client in arrears for each monthly billing period ("Billing Period") for all Fees and Expenses. Any such invoice shall be payable by check, wire transfer, or ACH. Payment is due within 14 days of the end of each monthly Billing Period. If payment is not received by due date, Company, at its sole discretion, may suspend providing Services or may continue to provide Services without providing Type A Deliverables to Client. In the event of any dispute with regard to a portion of an invoice, the undisputed portion shall be paid as provided herein.

**6.1.3 Expenses** Client shall reimburse Company for all materials and reasonable out-of-pocket expenses incurred in connection with the performance of its obligations under this Agreement ("Expenses"). Company shall obtain Client's prior written approval for any single out-of-pocket Expense that is anticipated to exceed $500 and/or any aggregated out-of-pocket Expenses that are anticipated to exceed $2,000. Expenses incurred for approved travel will be billed to Client at the direct costs incurred by the Company, and will include a per diem covering the costs of food and incidentals, at a rate of $65 per person, per day. If Company incurs out-of-pocket expenses for third-party products or services purchased on behalf of Client, a five percent (5%) markup will be added to cover bookkeeping and associated administrative expenses.

**6.1.4 Credits** In the event that Client has not received Services for which Fees have been invoiced, Client shall be credited on a prorated basis. Client shall receive a credit if the total number of hours of Services provided is less than the invoiced Team Strength multiplied by thirty-five (35).

## 7. Term and Termination

### 7.1 Notice

Either party may terminate this Agreement, any Statement of Work, or reduce Team Strength upon ninety (90) days written notice to the other party.

### 7.2 Monetary Breach

If a party fails to make a monetary payment as specified in this Agreement, the non-breaching party shall notify the other party of such failure and if the breaching party fails to cure such breach within three (3) business days, the non-breaching party may immediately terminate this Agreement or any Statement of Work. Notwithstanding the foregoing, the Company shall not be obligated to provide Client with notice and an opportunity to cure a payment default more than once in any twelve (12) month period, and in the event of multiple payment defaults in any twelve (12) month period, may immediately terminate this Agreement or any Statement of Work.

### 7.3 Continuation

This Agreement shall remain in full force and effect and govern Services provided to Client by Company until this Agreement is terminated, or the parties mutually agree otherwise.

### 7.4 Termination

Upon termination of this Agreement for any reason: (a) Client shall immediately pay to Company all amounts owed to Company pursuant to Section 6 hereof for Services performed and expenses incurred prior to the date of termination; (b) each party shall immediately cease all use of and shall return to the other party within five (5) business days all Confidential Information and materials of such other party and all copies, portions and abstracts thereof, that are in its possession or under its control, other than any materials for which Client has paid or agrees to pay. Company shall deliver to Client such portion of the Services that are complete.

## 8. Confidentiality

### 8.1 Confidential Information

In connection with this Agreement, Client may disclose, or Company may learn of or have access to, certain confidential proprietary information owned by Client or its affiliates, business partners or clients ("Confidential Information"). Confidential Information includes, but is not limited to, any data or information, oral or written, that relates to Client or any of Client's existing or contemplated business activities, technology, developments, software, methods, trade secrets, and clients. Confidential Information also includes the terms of this Agreement and the Services.

### 8.2 Public Domain

Notwithstanding the foregoing, Confidential Information is deemed not to include information that: (i) is publicly available or in the public domain at the time disclosed, (ii) is or becomes publicly available or enters the public domain through no fault of Company, (iii) is rightfully communicated to Company by persons not bound by confidentiality obligations with respect thereto, (iv) is already in Company's possession free of any confidentiality obligations with respect thereto, (v) is independently developed by Company without use of any Confidential Information or (vi) is approved for release or disclosure by Client in writing without restriction.

### 8.3 Limitation of Disclosures

During the term of its engagement and for all periods thereafter, Company shall maintain the Confidential Information in strict

confidence and shall not disclose, publish or copy any part of the Confidential Information. Company shall use the Confidential Information solely for the purpose of performing its obligations under this Agreement. Company shall not use the Confidential Information, or any portion thereof, for its own benefit or for the benefit of any third-party. Company shall take all necessary precautions in handling the Confidential Information and limit disclosures on a strict need-to-know basis. However, Company may disclose Confidential Information pursuant to the order or requirement of a court, administrative agency, or other governmental body, provided that Company gives reasonable prior notice to Client to contest such order or requirement. Upon the termination or expiration of this Agreement, Company shall return to Client or certify the destruction of all Confidential Information.

### 8.4 Publicity

Notwithstanding anything to the contrary in the Agreement or applicable Statements of Work, Company shall be permitted to disclose in summary form the nature of the work performed for Client under the applicable Statement of Work. Such disclosure includes a description of the technology utilized by Company, but Company shall not disclose the proprietary business processes of Client or otherwise result in any breach of any other term of this Agreement. All press releases and other publicity relating to Client or the Services must be pre-approved by Client until Client's Business is generally accessible by the public without invitation, and such approval not to be unreasonably denied or delayed. Notwithstanding the foregoing, at such point when Client's Business is generally accessible by the public without invitation, Company shall have the unilateral right to publicize Services relating to Client, including but not limited to listing Client as a client of Company on Company's website. Publicity represents value for Company, which value is reflected in the price of the Services.

### 8.5 Reference

Notwithstanding anything to the contrary in the Agreement or applicable Statements of Work, each party is entitled to reference the other party and describe work completed under this Agreement and any related Statements of Work in summary and general form, without revealing any of the other party's confidential information.

## 9. General Provisions

### 9.1 Notices

All notices required shall be in writing and shall be effective on the date of mailing to the parties at the addresses previously indicated, to the attention of the signers of this Agreement, or to such other address as designated by the parties in writing, and sent via registered U.S. mail, or by email to the Client's Representative or Company's Representative, respectively, to the extent such email has been acknowledged by the receiving party (whether direct or implied by virtue of response, forward, or otherwise).

### 9.2 Severability

Each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law. The invalidity or unenforceability of any provision of this Agreement shall in no way affect the validity or enforceability of any other provision hereof. Any invalid or unenforceable provision shall be deemed severed from this Agreement and the balance of this Agreement shall be construed and enforced as if this Agreement did not contain the particular provisions(s) held to be invalid or unenforceable.

### 9.3 Waiver

The waiver of a breach of this Agreement or the failure of a party to exercise any right under this Agreement shall in no event constitute a waiver as to any other breach, whether similar or dissimilar in nature, or prevent the exercise of any right under this Agreement.

### 9.4 Force Majeure

Neither party shall be responsible for any failure to perform, or delay in performing any of its obligations under this Agreement, where and to the extent that such a failure or delay results from causes outside the control of such party. Such causes shall include, without limitation, delays caused by the other party, acts of God or of the public enemy, acts of the

government in its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, freight embargoes, strikes, civil commotion, or the like.

### 9.5 Headings

Section headings are for the convenience of the parties and should not be construed as part of this Agreement.

### 9.6 Governing Law

This Agreement shall be deemed executed in Rhode Island and shall be governed by the laws of the State of Rhode Island. For purposes of enforcement, equitable relief, or if for any other reason litigation is permissible under this agreement, each party hereby irrevocably agrees to the personal jurisdiction and venue of any court located in Providence County, Providence, Rhode Island.

### 9.7 Survival

The provisions of Sections 4, 5, and 8 shall survive the expiration or termination of this Agreement. All other provisions of this Agreement, including any Exhibits and Statements of Work hereto which by their terms or import are intended to survive such expiration or termination, shall survive.

### 9.8 Entire Agreement

This Agreement supersedes all prior oral or written representations, communications, or agreements between the parties, and, together with any appendices, constitutes the final and entire understanding of the parties regarding the subject matter of this Agreement. Neither party has relied on any such prior oral or written representations, communications, or agreements.

### 9.9 Disputes

Any controversy or claim between the parties shall be settled first by negotiation between the parties' respective project managers. In the event the project managers are unable to resolve the dispute in a reasonable period of time, the parties agree to elevate the dispute to their respective Presidents or equivalent officer. If, after a reasonable period of time, the parties' are still unable to resolve the dispute, the parties agree to settle the dispute in state or federal courts located in Providence County, Providence, Rhode Island. With respect to any litigation brought pursuant to this Agreement, the parties agree that upon a judgment being entered by a court of competent jurisdiction, the prevailing party in such litigation shall be entitled to reimbursement of that party's reasonable attorney's fees from the losing party.

### 9.10 Waiver Of Trial By Jury

EACH OF THE PARTIES HERETO HEREBY VOLUNTARILY AND IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION OR OTHER PROCEEDING BROUGHT IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY. NO PARTY HAS AGREED WITH OR REPRESENTED TO ANY OTHER PARTY THAT THE PROVISIONS OF THIS SECTION WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

### 9.11 Execution

This Agreement may be executed (including by facsimile or Internet-based service) by one or more of the parties on any number of separate counterparts. All of such counterparts taken together shall be deemed to constitute one and the same instrument, and (if by facsimile) each such facsimile shall have the same force and effect as if an original.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have each caused to be affixed hereto its or his/her hand and seal the day indicated.

SPAR Group, Inc. (Client)

Signature: [signature]

Name: WILLIAM LINNANE

Title: CHIEF STRATEGY & GROWTH OFFICER

Date: AUGUST 19, 2022

MojoTech, LLC (Company)

Signature: [signature]

Name: Bing Chou

Title: VP Client Engagement

Date: August 17, 2022

1709139_1/11354-1

# EXHIBIT B

**Dated March 16th, 2026**
**SOW 2 of 2026 - Data Integration Layer MVP Build**

This Statement of Work dated March 16th, 2026 is made between MojoTech, LLC, a Delaware limited liability company with its principal place of business at 56 Exchange Terrace Suite 210 Providence, RI 02903 ("Company") and SPAR Group, Inc. having offices at 110 East Boulevard, STE 1600, Charlotte, NC 28203, or its assigns ("SPAR" or "Client"). This SOW is made pursuant to the Master Services Agreement dated August 16, 2022 between Company and Client (the "Master Agreement"). All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Master Agreement.

**Project Summary**

SPAR is on an exciting journey to modernize its IT infrastructure, and capitalize on its data from customers, generate new revenue streams, and gain efficiencies internally.

This SOW defines an implementation phase as a result of our original SOW in 2026 for a data integration layer design.

This SOW demonstrates MojoTech's ability to rapidly develop an MVP as agreed upon for the Data Integration Layer, which will set the foundation for SPARs infrastructure moving forward.

Detailed in the sections below share the full scope of the MVP and the intended delivery timeline.

**Project Scope**

**MVP Project Scope:**

1. Databricks implementation on AWS
    a. AWS Workspace Provisioned
    b. Databricks workspace Provisioned
    c. Networking/Environments setup
2. SparView(SQL Server) data ingested in real time using Databricks Lakeflow Connect
    a. Data to be ingested will include store visits, work orders
3. SparView data stored in AWS S3 + Data Lake
4. Image and metadata ingestion and processing in Databricks
5. Connectors and Pipelines setup for additional data source ingestion
6. Data Governance deployed on AWS (Databricks Unity Catalog + AWS native services) for data auditability, quality and security and compliance
7. Performance Tuning, UAT, ML Setup

**Out of Scope for MVP:**

1. PowerBI report and dashboard creation
2. Data ingestion from Workday, ClearBox, ParallelDots, iCIMS, Mobile app, 3rd party client data

**Project Deliverables**

1. Databricks provisioned and setup on AWS
2. Networking configured for data ingestion
3. SparView data stored in AWS S3 + Data Lake following the Medallion architecture, which organizes data into three distinct layers: Bronze (raw), Silver (cleansed), and Gold (curated/business-ready)
4. 1 gold table that will serve up to 5 PowerBI reports. Additional gold tables to be delivered post-MVP or within MVP depending on time and complexity

Upon Client request, Vendor shall provide reasonable transition assistance to Client or Client-designated vendors to transfer knowledge of the Deliverables and architecture. Such assistance shall include documentation of the solution architecture, deployment configuration, and data pipelines, and up to forty (40) hours of transition support. Client will pay vendors on an actual basis for the transition phase. E.g. if the transition period happens outside of the estimated 15 weeks, Client will pay for the time to perform services by the Company.

*Deliverables are expected to include:*

MojoTech will deliver an MVP Data Integration layer codebase in SPARs environment, along with any necessary documentation.

MojoTech will not deliver transition materials or onboard 3rd party vendors as a part of this SOW. With the known intent of SPAR to onboard these partners, we will collaborate with key stakeholders to plan what this transition past the MVP looks like.

**Project Approach**

This project is estimated and planned to be completed over the course of 15 weeks, with a small focused engineering team. This allows for an initial phase to set up the foundational architecture, handle initial complexity of the data sources and implement business rules & transformations through the silver and gold layers. Subsequent releases will follow patterns that are set up in the MVP and are more easily transitioned to offshore or nearshore delivery centers.

During this phase, MojoTech will move through and deliver the below milestones:

| Milestone # | Milestone | Key Output | Primary Capability Unlocked |
|---|---|---|---|
| M0 | Foundation | Environment + networking live | Tools provisioned, architecture validated and team can build |
| M1 | SPARView Ingestion | Bronze layer automated | First data pipeline, SPARView, data captured continuously |
| M2 | Silver Layer | Validated, integrated datasets with governance implemented | Trustworthy data; Data quality enforcement begins |
| M3 | Gold + Power BI | Gold Tables or PowerBI objects that enable reports to be built | End-to-end pipeline complete; Reporting enabled; Agentic use case enablement |

*Project Delivery Assumptions:*

- Access / Permissions: these must be granted at least 5 business days prior to kick off
  - The team will have access to the following data: SQLServer database and tables, PowerBI DAX queries, Drive for data files
  - The AWS Workspace will be accessible with accounts and correct permissions
  - A Databricks account is provisioned
- Image Data
  - Since the use case for images has not been defined, we will set up the ability to import images into the Data Integration Layer, but will not replicate any images from S3
- Replication Cadence
  - Replication of data from Sparview will need to be nearly real-time and will capture changes to the data as they occur
- Availability of SPAR Team
  - SPAR Team members familiar with the data and systems will be needed to answer questions and approve implementation strategies
  - The Client will make relevant team members available for up to fifteen (15) hours per week to support collaboration, feedback, and review. Anticipated roles: Analytics Product Owner (Sunday Ojo); Data SMEs (Jacquiline Di Fonzo) ; Exec Sponsor (Josh Jewett)
  - For any scope prioritization or technical decision making that requires SPAR input & sign-off, SPAR are able to make decisions that MojoTech surfaces within a short timeframe so as to keep delivery on track
- Dashboard Capabilities
  - PowerBI capabilities are assumed to live with SPAR's team. This resource will need to be engaged early into the program
- Vendor shall implement the solution using commercially reasonable cloud cost optimization practices. All cloud resources, clusters, and compute configurations will be reviewed with Client prior to deployment. Vendor will provide documentation of infrastructure configuration, cluster sizing, and recommended cost management practices prior to project completion.
- Vendor will also configure monitoring or alerts for cloud resource consumption where reasonably practicable.

**Project Schedule**

This project will start on or about March 16th, 2026 and end on or about June 26th, 2026.

Client may suspend the Services for up to ten (10) business days upon written notice. During such suspension the parties will cooperate in good faith to resume Services as soon as reasonably practicable, and the project schedule will be adjusted to reflect the suspension period without additional fees or penalties. Suspension will be allowed up to one time for this agreement.

In the absence of anything in writing, client and Company agree to discuss and negotiate in good faith.

**Fees and Resourcing**

The Company will bill the Client based on the scope of work for the Client's project (Team Strength). The Team provided is shared below. Services are performed on a Fixed Fee basis.

*Should this phase of the program extend beyond the initial estimated fifteen (15) weeks due to any assumptions not being met, Client will be billed at a weekly bill rate of 26K and will be covered with a Change Order. This process will be governed through a Weekly Update to the SPAR Program Leadership to ensure visibility of any risks, blockers, and mitigations.*

*Any extension of the project schedule or additional fees must be approved by Client in writing prior to the commencement of such additional work.*

| Role | Allocation | Total Weeks | Total Cost |
|---|---|---|---|
| Product Manager | Part Time | 15 | - |
| Data Architect | Full Time | 15 | - |
| Data Engineer (2) | Full Time | 15 | - |
| **Total** | | | **$396,000** |

The Company will charge $396,000 in project fees, plus travel fees as needed. All travel to be approved prior to booking.

Project delays caused by vendor staffing, performance issues, or rework of previously delivered deliverables shall not constitute unmet assumptions and shall not trigger additional weekly fees.

Any additional fees for technical access to tools will be approved by the client prior to purchase.

Written approval of changes in Scope and Team Strength, including additions may be provided through a Change Order process. Written approval for extending and/or expanding projects may also be provided electronically.

Any travel fees will be billed directly to the client, in accordance with the MSA.

Client will be invoiced on the following schedule, which will be tied to the end of each sprint and the acceptance of deliverables created during that sprint. Clients will have up to 2 business days to accept or reject any deliverables based on the sprint's work.

Billings will happen after the client accepts the deliverables.

| Invoice # | Sprint # | Date (Tentative dates until program officially kicks off) | Amount |
|---|---|---|---|
| #1 | 1 | 3/27/2026 | $49,500 |

| | | | |
|---|---|---|---|
| #2 | 2 | 4/10/2026 | $49,500 |
| #3 | 3 | 4/24/2026 | $49,500 |
| #4 | 4 | 5/8/2026 | $49,500 |
| #5 | 5 | 5/22/2026 | $49,500 |
| #6 | 6 | 6/5/2026 | $49,500 |
| #7 | 7 | 6/19/2026 | $49,500 |
| #8 | Project Close - 1 week after sprint 7 | 6/26/2026 | $49,500 |
| Total Billing* = $396,000 | | | |

*excluding reimbursement for pre-approved travel and expenses.

**Expiration**

Client may terminate this Statement of Work for convenience upon forty five (45) days written notice to Vendor.

Upon termination for convenience, Client shall pay only for Services actually performed and accepted prior to the effective date of termination and for approved expenses incurred prior to such date. In no event shall Client be liable for fees related to Services not performed or Deliverables not accepted as of the termination date.

This agreement is null and void if not executed within 5 days.

[Signature Page Follows]

SPAR Marketing Force, Inc (Client)

Signature: Signed by: [signature] D7F1600A9C55421...

Name: Joshua R. Jewett

Title: CTO

Date: 3/16/2026

MojoTech, LLC (Company)

Signature: [signature]

Name: Jason Grimm

Title: CEO

Date: March 16, 2026

# EXHIBIT C

Case Number: PC-2026-05196
Filed in Providence/Bristol County Superior Court
Submitted: 9/17/2026 3:16 PM
Envelope: 5843489
Reviewer: Alexa G.
Docusign Envelope ID: 5D3AB5FD-075A-49B3-9BB6-0FACDA28BF1B

mojotech

**Dated April 8, 2026**
**SOW 3 of 2026 - Agentic Field Management Design Phase SOW**

This Statement of Work dated April 8, 2026 is made between MojoTech, LLC, a Delaware limited liability company with its principal place of business at 56 Exchange Terrace Suite 210 Providence, RI 02903 ("Company") and SPAR Group, Inc. having offices at 110 East Boulevard, STE 1600, Charlotte, NC 28203, or its assigns ("SPAR" or "Client"). This SOW is made pursuant to the Master Services Agreement dated August 16, 2022 between Company and Client (the "Master Agreement"). All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Master Agreement.

## Project Summary

SPAR is on an exciting journey to modernize its IT infrastructure, and capitalize on its data from customers, generate new revenue streams, and gain efficiencies internally.

In this Statement of Work, SPAR is seeking to modernize its field operations through the introduction of an agentic workflow platform that enables intelligent scheduling, job matching, and communication orchestration.

This SOW defines an expedited 8-week design phase to:

- Identify and validate high-impact automation opportunities
- Define the product, technical, and data foundations for an agentic platform
- Produce a clear roadmap to MVP and production

This phase builds toward transforming SPAR's field operations from manual coordination to intelligent orchestration.

The platform is intended to enhance, and where appropriate automate, elements of operational decision-making while maintaining appropriate levels of human oversight and control.

As part of this engagement, MojoTech will evaluate architectural approaches to determine how and where these capabilities should be implemented within SPAR's technology environment. This includes assessing whether the solution should be integrated into existing systems or developed as a distinct application within SPAR's broader ecosystem, and defining the associated technical, data, and operational implications of each approach.

Given the early-stage nature of this initiative, certain foundational questions remain open and will be addressed during the course of the engagement, including system architecture, product boundaries, and integration requirements. The Services defined under this SOW are intended to reduce this ambiguity and provide SPAR with a clear, informed path forward.

## Design Phase Project Scope:

MojoTech will support the design of an agentic field management platform for SPAR. Services will include stakeholder engagement, current-state workflow analysis, future-state design, and technical definition required to enable MVP implementation.

MojoTech will conduct targeted interviews with SPAR stakeholders and end users to understand existing scheduling, job assignment, and communication workflows, and will identify opportunities for improved efficiency and intelligent automation. Based on these findings, MojoTech will define a future-state product vision, including key workflows, user interactions, and decisioning approaches that balance automation with appropriate human oversight.

MojoTech will also define the technical approach required to support the proposed solution, including system architecture, data inputs and outputs, and high-level orchestration of agentic capabilities.

As part of this engagement, MojoTech will define an MVP scope and prioritized feature set sufficient to support transition into a subsequent implementation phase, including key capabilities, dependencies, and sequencing required to initiate development.

The Services will be performed in an iterative manner and refined through collaboration with SPAR stakeholders.

**Out of Scope for this Design Phase:**

For clarity, the following items are explicitly out of scope for this SOW:

- Full product roadmap development beyond MVP scope, including detailed long-term product planning or multi-phase delivery roadmaps
- Software development, engineering, or configuration, including build, integration, or deployment of any systems or features
- Production implementation or release of an MVP or live system
- Detailed technical specifications required for engineering execution (beyond design-level architecture and planning artifacts)
- Change management, training, or organizational rollout activities
- Ongoing product management or program management beyond the duration of this engagement
- Use case design & product solutioning that are not within the scope of Field Management

Any services outside the scope defined above may be addressed through a subsequent Statement of Work.

## Project Deliverables

MojoTech will produce deliverables that document the outcomes of the design phase and support transition into a subsequent implementation phase. These deliverables are intended to provide SPAR with a clear product vision, defined technical direction, and an actionable path to MVP implementation.

*Deliverables are expected to include:*

**Product & Strategy Deliverables**

- North Star Product Vision, including: (.pdf)
    - Scheduling Module
    - Communications Module
- Decisioning Logic for the Application (.pdf, .xls)
    - This will include definition of schedule and job matching logic, including inputs, constraints, prioritization rules and fallback handling
- Roadmap, including:
    - MVP / Near-Term Release (.pdf)
    - Epic Backlog (.xls)

Case Number: PC-2026-05196
Filed in Providence/Bristol County Superior Court
Submitted: 9/17/2026 3:16 PM
Envelope: 5843489
Reviewer: Alexa G.

Docusign Envelope ID: 5D3AB5FD-075A-49B3-9BB6-0FACDA28BF1B

- High Level Implementation Plan (.pdf)
    - Including high level definition of system components, data flows, and integration points required to support MVP implementation (.pdf)
    - Includes identification of technical, data, and operational risks that could impact implementation, performance, or scalability

**Technical Deliverables**

- Technical Architecture, including evaluation of: (.pdf)
    - Standalone vs. integrated approach within SPAR's environment
    - Systems that will be integrated with
    - Systems that will be new custom development
- Data Inputs and Outputs required to support intelligent workflows (.pdf)
- AI Technical Blueprint, including: (.pdf)
    - Agent roles and behaviors
    - Decisioning framework (automation vs. human-in-the-loop)
    - Data flow and orchestration logic

**Design Deliverables**

- Personas and User Journeys, including: (.pdf)
    - Zone Leads
    - Merchants / On the ground representatives
    - Talent / Workforce
- Process Maps, including:
    - Current-State workflows
    - Future-State workflows
- Wireframes for core user workflows ("happy path"), including:
    - Scheduling
    - Communications
    - Job Matching
- Assumes approximately 5–8 wireframes per core workflow

Deliverables may be refined throughout the engagement based on findings, stakeholder feedback, and prioritization decisions made during the design process.

## Project Approach

This project will be executed over approximately eight (8) weeks using an expedited delivery model. The engagement will follow MojoTech's design methodology for agentic systems, structured across three phases: Learn, Design, and Plan. Work will be performed iteratively, with defined alignment points to ensure SPAR stakeholders are engaged at critical decision-making moments.

Phase 1: Learn (Discovery & Research)

During this phase, MojoTech will conduct stakeholder and user interviews, review existing systems, and document current-state workflows across scheduling, job matching, and communication processes. Insights from this phase will be synthesized into foundational artifacts, including user personas, journey maps, and current-state process documentation.

Phase 2: Design (Solution Definition)

MojoTech will define the future-state experience and system design, including how agentic capabilities will be applied across workflows. This includes defining user interactions, workflow improvements, and the technical approach required to support intelligent decisioning.

Phase 3: Plan (MVP Definition & Readiness)

In the final phase, MojoTech will define the MVP scope and prepare for transition into implementation. This includes prioritization of features, sequencing of work, and alignment on the path to production.

*Milestone Alignment Points*

Throughout the engagement, MojoTech will align with SPAR stakeholders at key milestones to review progress, validate direction, and support decision-making. These alignment points represent critical checkpoints for the business:

- *North Star Vision Alignment*
  Alignment on the future-state product vision, including core workflows, user experience, and overall direction of the agentic platform
- *MVP Scope Alignment*
  Alignment on the defined MVP scope, including prioritized features, key capabilities, and boundaries for initial implementation
- *Implementation Design & Approach Alignment*
  Alignment on the technical approach, system architecture, and implementation plan required to move into the build phase

MojoTech will use commercially reasonable efforts to execute this approach. The timing and sequencing of milestone alignment points are dependent on timely access to stakeholders, systems, and feedback from SPAR.

## Assumptions

## Project Assumptions

- All access and materials will be provided 5 business days ahead of kick off
- Wireframe deliverables will be primarily wireframe-fidelity, focusing on UX logic. Execution-ready UI (including final spacing, variables, and production assets), comprehensive design systems, and detailed component documentation are excluded.
- Usability testing and user validation of wireframes will not be performed in this design phase
- Part of the initial learnings will be existing product demos/walkthroughs from SMEs. We will need access to SPAR SMEs who are comfortable with the tools and able to screenshare and take us through the end-to-end experience.
- We are able to speak to 3-5 users per user role identified in order to capture requirements, workflow and wireframe input
- This projects scope is only for North America, the US and Canada specifically
- 3rd party vendors that SPAR is working with will be identified ahead of project kick off (such as Clearbox, or Ring Central)

## General Assumptions

- SPAR will provide timely access to relevant systems, documentation, and data required to perform the Services

- SPAR will make available appropriate stakeholders, including an executive sponsor, product owner, SMEs, and end users
- SPAR will make available a project manager who can resolve escalations, blockers, system access, SME availability, etc
- SMEs and stakeholders will be available for approximately 10–15 hours per week to support interviews, reviews, and alignment
- Kickoff activities and initial interviews will be scheduled at or near the start of the engagement
- SPAR will provide timely feedback and decision-making to maintain the expedited timeline
- Any delays in access, stakeholder availability, or approvals may result in adjustments to timeline and/or level of effort
- MojoTech is not responsible for delays caused by Client dependencies

## Project Schedule

This project is expected to start on or about the week of April 20, 2026 and continue for approximately eight (8) weeks. Any changes to the schedule will be mutually agreed upon in writing.

Client may suspend the Services for up to ten (10) business days upon written notice. During such suspension the parties will cooperate in good faith to resume Services as soon as reasonably practicable, and the project schedule will be adjusted to reflect the suspension period without additional fees or penalties. Suspension will be allowed up to one time for this agreement.

## Fees and Resourcing

The Company will bill the Client at a weekly estimated price of $46,875 on a time and materials basis for Services performed under this SOW.

MojoTech will provide a delivery team consisting of product, design, and technical resources appropriate to support the expedited nature of the engagement, including Product Management, Technical Architecture, and UX Strategy roles.

Based on current assumptions, total fees are estimated to be $375,000. This estimate is non-binding and actual fees will be based on time expended. Total fees under this Statement of Work shall not exceed $375,000 without prior written approval from the Client.

MojoTech will invoice on a regular basis for Services performed. Any changes to scope, timeline, or team composition will be handled through a written Change Order. Any billings in excess of the estimated total fees must be approved by the client in writing prior to the commencement of such additional work.

Travel expenses will be pre-approved and billed in accordance with the Master Agreement.

*Should this phase of the program vary beyond the initial estimated eight (8) weeks due to any assumptions not being met, Client will be billed for the time of the team. Any billings beyond the estimated amount will be discussed and governed by a Weekly Update to the SPAR Program Leadership to ensure visibility of any risks, blockers, and mitigations.*

*During this weekly update, Client will receive a financial report to understand if the fees and scope are in line with assumptions made during the proposal phase. MojoTech will provide a weekly summary of hours expended and forecasted effort to complete the services, including identification of any risk of exceeding the total estimated fees.*

## MojoTech Program Resources:

| Role | Allocation | Total Weeks |
|---|---|---|
| Product Manager | Full Time | 8 |
| Technical Architect (2) | Full Time | 8 |
| Product Design Strategist (2) | Full Time | 8 |
| SME Hours | Part Time (up to 15 hours per week) | 8 |

## Client Resources

All work to be performed will be described and prioritized in alignment with both parties. The Company will report progress to the Client Representative (Josh Jewett), or its designee, no less frequently than once per week.

A project of this nature requires additional roles and support from the client to drive a successful outcome. Below are the roles that we have identified as critical to the business outcomes. The client will identify these representatives ahead of project kick off:

| Role | Role Details |
|---|---|
| Project Manager | Support in scheduling, ensuring blockers are cleared, and all access is granted |
| Product Owner(s) | This role will act as the key client stakeholder to direct the product vision from a business lens |
| Technical Lead | This role will act as a liaison to the SPAR IT and infrastructure team, as well as support in discussions around future architecture diagrams and decisions |
| SME Hours | We will need support from the following teams, and expect the project manager and product owners to support in identifying the right team members:<br>• Zone Leads<br>• Field Agents |

Any additional fees for technical access to tools will be approved by the client prior to purchase.

Written approval of changes in Scope and Team Strength, including additions may be provided through a Change Order process.

Clients will be invoiced on the following monthly schedule from the date of program kick off.

| Invoice # | Date (Tentative dates until program officially kicks off) | Amount |
|---|---|---|
| #1 | 5/8/2026<br>(or 4 weeks after the program begins) | Estimated to be $187,000, will reflect actual work completed |
| #2 | 6/5/2026<br>(or the final day of the 8 week engagement) | Estimated to be $187,000, will reflect actual work completed |
| Total Billing* = $375,000<br><br>This reflects the total estimated work, actuals will be billed monthly. | | |

## Expiration

This agreement is null and void if not executed within 5 days.

*Signature Page Follows*

SPAR Group, Inc.
Company Name

Signed by:

Authorized Signature

Joshua R Jewett
Printed Name

MojoTech, LLC
Company Name

Signed by:

Jason Grimm

Authorized Signature

Jason Grimm
Printed Name

# EXHIBIT D

**MOJOTECH LLC**
56 Exchange Terrace
Suite 210
Providence, RI 02903 US
accounting@mojotech.com
www.mojotech.com

# INVOICE

**BILL TO**
SPAR Group, Inc
110 East Blvd
Charlotte, NC 28203
United States

**INVOICE #** INV-1134
**DATE** 05/06/2026
**DUE DATE** 05/19/2026
**TERMS** Net 14

| TEAM | AMOUNT |
|---|---|
| MojoTech Team 1<br>Core Development Team<br>"Invoice 3" Data Integration Layer Design SOW<br>May 2026 | 49,500.00 |

BALANCE DUE **$49,500.00**

Please pay by bank transfer to the following account, below are the bank details for your reference:
Bank Name: Eastern Bank
Routing #: 011301798
Account #: 1267326237
Thank you for your business!

Interest will accrue at 1% per month, beginning one month past the due date listed on the invoice.

Case Number: PC-2026-05196
Filed in Providence/Bristol County Superior Court
Submitted: 9/17/2026 3:16 PM
Envelope: 5843489
Reviewer: Alexa G.

**MOJOTECH LLC**
56 Exchange Terrace
Suite 210
Providence, RI 02903 US
accounting@mojotech.com
www.mojotech.com

# INVOICE

**BILL TO**
SPAR Group, Inc
110 East Blvd
Charlotte, NC 28203
United States

**INVOICE #** INV-1139
**DATE** 05/15/2026
**DUE DATE** 05/28/2026
**TERMS** Net 14

| TEAM | AMOUNT |
| --- | --- |
| MojoTech Team 1<br>Core Development Team<br>"Invoice 1" Field Management Project SOW May 2026 | 187,500.00 |

BALANCE DUE **$187,500.00**

Please pay by bank transfer to the following account, below are the bank details for your reference:
Bank Name: Eastern Bank
Routing #: 011301798
Account #: 1267326237
Thank you for your business!

Interest will accrue at 1% per month, beginning one month past the due date listed on the invoice.

**MOJOTECH LLC**
56 Exchange Terrace
Suite 210
Providence, RI 02903 US
accounting@mojotech.com
www.mojotech.com

# INVOICE

**BILL TO**
SPAR Group, Inc
110 East Blvd
Charlotte, NC 28203
United States

**INVOICE #** INV-1141
**DATE** 05/21/2026
**DUE DATE** 06/03/2026
**TERMS** Net 14

| TEAM | AMOUNT |
| --- | --- |
| MojoTech Team 1<br>Core Development Team<br>"Invoice 4" Data Integration Layer Design SOW<br>May 2026 | 49,500.00 |

BALANCE DUE **$49,500.00**

Please pay by bank transfer to the following account, below are the bank details for your reference:
Bank Name: Eastern Bank
Routing #: 011301798
Account #: 1267326237
Thank you for your business!

Interest will accrue at 1% per month, beginning one month past the due date listed on the invoice.

**MOJOTECH LLC**
56 Exchange Terrace
Suite 210
Providence, RI 02903 US
accounting@mojotech.com
www.mojotech.com

# INVOICE

**BILL TO**
SPAR Group, Inc
110 East Blvd
Charlotte, NC 28203
United States

**INVOICE #** INV-1142
**DATE** 05/22/2026
**DUE DATE** 06/04/2026
**TERMS** Net 14

| TEAM | AMOUNT |
| --- | --- |
| MojoTech Team 1<br>Core Development Team<br>"Invoice 5" Data Integration Layer Design SOW<br>May 2026 | 9,900.00 |

BALANCE DUE **$9,900.00**

Please pay by bank transfer to the following account, below are the bank details for your reference:
Bank Name: Eastern Bank
Routing #: 011301798
Account #: 1267326237
Thank you for your business!

Interest will accrue at 1% per month, beginning one month past the due date listed on the invoice.

# EXHIBIT E

Case Number: PC-2026-05196
Filed in Providence/Bristol County Superior Court
Submitted: 9/17/2026 3:16 PM
Envelope: 5843489
Reviewer: Alexa G.


PARTRIDGE SNOW & HAHN LLP

Kevin Keenan
401-861-8228
Kkeenan@psh.com

September 1, 2026

**VIA FEDEX OVERNIGHT MAIL**

SPAR Group, Inc.
Attn: William Linnane, President and Chief Executive Officer
Attn: Steven Hennen, Chief Financial Officer
110 East Boulevard, Suite 1600
Charlotte, NC 28203

**Re:** Demand for Payment — MojoTech, LLC
Master Services Agreement dated August 16, 2022
Balance Due: $**296,400.00**, plus accrued interest

Dear Mr. Linnane and Mr. Hennen:

Please be advised that our office represents MojoTech, LLC ("MojoTech") in the above-captioned matter. Please consider this correspondence as a formal demand for payment of **$296,400.00**, together with interest, for services MojoTech performed for SPAR Group, Inc. ("SPAR") and invoiced to SPAR in April and May of 2026. Unless MojoTech is paid in full, or SPAR or its counsel contacts the undersigned, on or before **Friday, September 4, 2026**, MojoTech will file suit.

**The Agreements and MojoTech's Performance**

MojoTech and SPAR are parties to a Master Services Agreement dated August 16, 2022 (the "MSA"), executed on SPAR's behalf by William Linnane. The parties thereafter executed Statements of Work under the MSA, dated March 16, 2026 and April 8, 2026. Each Statement of Work states that it "is made pursuant to the Master Services Agreement dated August 16, 2022 between Company and Client." Copies of the MSA and the Statements of Work are enclosed.

MojoTech performed every obligation those agreements required of it. It staffed both engagements and delivered the work product called for by each Statement of Work. At no time has SPAR rejected a deliverable, disputed the quality or sufficiency of MojoTech's work, or disputed any invoice.

The engagements ended for reasons that had nothing to do with MojoTech's performance. In early June 2026, Mr. Joshua Jewett on behalf of SPAR directed MojoTech to stand down, citing

a change in SPAR's strategic direction. MojoTech has performed no work for SPAR since that date.

**The Amounts Owed**

MojoTech issued the following invoices, copies of which are enclosed:

| Invoice No. | Invoice Date | Due Date | Amount | Status |
|---|---|---|---:|---:|
| INV-1124 | 04/24/2026 | 05/07/2026 | $49,500.00 | Paid 08/27/2026 |
| INV-1134 | 05/06/2026 | 05/19/2026 | $49,500.00 | Unpaid |
| INV-1139 | 05/15/2026 | 05/28/2026 | $187,500.00 | Unpaid |
| INV-1141 | 05/21/2026 | 06/03/2026 | $49,500.00 | Unpaid |
| INV-1142 | 05/22/2026 | 06/04/2026 | $9,900.00 | Unpaid |
| | | **Total invoiced** | **$345,900.00** | |
| | | **Less payment** | **($49,500.00)** | |
| | | **Balance due** | **$296,400.00** | |

The four unpaid invoices came due between May 19 and June 4, 2026. Each has now been outstanding for roughly three months, and the balance of $296,400.00 remains unpaid.

**SPAR's Acknowledgment of the Debt**

On or about June 15, 2026, Mr. Hennen and MojoTech's Chief Executive Officer, Jason Grimm, promised by telephone that SPAR would pay MojoTech $50,000.00 every two weeks until the balance was paid in full. Mr. Jewett had introduced Mr. Grimm to Mr. Hennen for that purpose on June 4, 2026, after SPAR's invoices had become past due. SPAR made three payments under that arrangement, of $50,000.33 on June 19, 2026, $44,999.67 on July 10, 2026, and $49,500.00 on July 24, 2026, and then stopped (the payments were accounted for when calculating the amount owed). Mr. Grimm's efforts to reach SPAR after that, which included three emails to Mr. Hennen on August 13, 18, and 20, 2026, a voicemail for Mr. Hennen on August 21, 2026, and an email to Mr. William Linnane on August 24, 2026, went unanswered.

That silence ended only when MojoTech raised the prospect of litigation. On August 26, 2026, Mr. Grimm advised Mr. Hennen that MojoTech would be engaging counsel to collect. SPAR paid $49,500.00 the following day, on **August 27, 2026**, which MojoTech applied to the oldest open invoice, INV-1124. Despite partial payment, there still remains a balance of **$296,400** plus interest.

**Interest and Attorney's Fees**

Each MojoTech invoice states on its face that "[i]nterest will accrue at 1% per month, beginning one month past the due date listed on the invoice." Interest is therefore accruing on each

Case Number: PC-2026-05196
Filed in Providence/Bristol County Superior Court
Submitted: 9/17/2026 3:16 PM
Envelope: 5843489
Reviewer: Alexa G.




unpaid invoice at that rate. In any action, MojoTech will also seek prejudgment and post-judgment interest at the rate provided by Rhode Island law. Furthermore, Section 9.9 of the MSA provides that "upon a judgment being entered by a court of competent jurisdiction, the prevailing party in such litigation shall be entitled to reimbursement of that party's reasonable attorney's fees from the losing party." If MojoTech is forced to file suit, when it obtains the judgment, SPAR will bear MojoTech's reasonable attorney's fees incurred in collecting a debt it has already admitted it owes.

**Demand**

MojoTech demands payment of **$296,400.00**, together with all interest accrued through the date of payment, on or before **Friday, September 4, 2026**. Payment may be made by bank transfer to the account identified on the enclosed invoices, or by check delivered to MojoTech, LLC, 56 Exchange Terrace, Suite 210, Providence, Rhode Island 02903 with an email confirmation to me that the payment has been made.

If MojoTech is not paid in full by that date, and SPAR's counsel has not contacted the undersigned, MojoTech will file suit against SPAR in the Rhode Island Superior Court for Providence County. That suit will assert breach of contract, unjust enrichment, and such other claims as the facts support, and MojoTech will pursue every remedy available under Rhode Island law to collect the judgment, including prejudgment attachment of SPAR's assets[1].

Please direct all communications concerning this matter to our office. If SPAR is represented by counsel, please have counsel contact us directly.

Very truly yours,

*/s/ Kevin J. Keenan*
Kevin J. Keenan

cc: Jason Grimm, Chief Executive Officer, MojoTech, LLC
Alicia J. Samolis

Enclosures: Master Services Agreement dated August 16, 2022
Statement of Work dated March 16, 2026
Statement of Work dated April 8, 2026
Invoices INV-1124, INV-1134, INV-1139, INV-1141, and INV-1142

4927-9281-7612

[1] Nothing in this letter waives any right, claim, or remedy available to MojoTech, all of which are expressly reserved. This letter is not a complete statement of the facts or of MojoTech's claims.